***********
The Full Commission has reviewed the Opinion and Award based upon the record of the proceedings before Deputy Commissioner Deluca and the briefs and arguments before the Full Commission. The appealing party has shown good grounds to reconsider the evidence, and upon reconsideration the Full Commission modifies in part and affirms in part the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as facts and concludes as matters of law the following, which were entered into by the parties in a pre-trial agreement as: *Page 2 
 STIPULATIONS
1. The parties are bound by and subject to the provisions of the North Carolina Workers' Compensation Act.
2. On May 20, 2002, plaintiff sustained a compensable injury by accident arising out of and in the course of his employment with defendant, when he injured his left knee and ankle.
3. Plaintiff's average weekly wage is $1,187.60, which yields a compensation rate of $654.00.
4. On May 20, 2002, an employer-employee relationship existed between plaintiff and defendant.
5. On May 20, 2002, defendant employed three or more employees.
6. On said date, defendant was self insured.
7. The history of payments since May 20, 2002, is as follows:
 a. Temporary total disability benefits were paid from May 21, 2002, until November 5, 2002.
 b. Plaintiff worked for defendant from November 6, 2002, until January 31, 2003.
 c. There was a dispute whether plaintiff was entitled to disability benefits between February 1, 2003, and April 3, 2004. This dispute was resolved by partial agreement and release dated January 4, 2004, and approved by the Industrial Commission on March 8, 2004.
 d. Disability benefits have been paid to plaintiff from November 1, 2003, to the present. *Page 3 
8. The Pretrial Agreement, dated February 16, 2006, is incorporated by reference. In addition, the parties stipulated into evidence documents which consisted of Industrial Commission forms, motions and orders; medical records; reports by vocational consultants; discovery responses; and miscellaneous exhibits.
9. The issues before the Commission are whether the Auditor I position offered by defendant was suitable employment and whether plaintiff was justified in his refusal of employment pursuant to N.C. Gen. Stat. § 97-32; whether plaintiff failed to cooperate with all vocational efforts, in violation of the Order by former Deputy Commissioner Edward Garner, Jr., filed March 8, 2004; what impact plaintiff's relocation to Arkansas had on vocational rehabilitation efforts; and what additional benefits, if any, plaintiff is entitled to receive.
 ***********
Based upon the foregoing stipulations and the evidence presented, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was born on September 27, 1945. He is a high school graduate and also earned about 40 hours of college credits.
2. Plaintiff was employed by defendant as a real estate appraiser from 1985 until May 20, 2002. The job required an ability to make mathematical calculations and considerable analytical skills. It also required field work, including walking on uneven surfaces. Plaintiff received good employment reviews from his supervisors and several merit raises.
3. On May 20, 2002, plaintiff was involved in an admittedly compensable motor vehicle accident that arose out of and in the course of his employment with defendant. He sustained injuries to his left foot and ankle, which included a talus fracture and open dislocations *Page 4 
of the ankle joint and the subtalar joint. Plaintiff underwent surgery on the left foot and ankle on May 20, 2002. He also sustained a left medial tibial plateau fracture, for which he underwent surgery on May 22, 2002. All of his injuries were to his left leg, ankle and foot.
4. Following his discharge from the hospital, plaintiff returned to Arkansas, where his mother and daughter resided, so that his family members could assist him in his recovery.
5. Plaintiff was seen by Dr. James Sebold on August 27, 2002, and x-rays were taken of his left knee and ankle during this period of time.
6. Plaintiff applied for Social Security disability benefits in September 2002 and for State of North Carolina disability retirement benefits in October 2002.
7. Dr. Sebold wrote on November 5, 2002, that plaintiff could return to work in a sedentary job the following day. Plaintiff returned to work for defendant on November 6, 2002 as a technical assistant in the Appraisal Division of the Mecklenburg County Tax Collector's office. This was a temporary position that was available as a result of the increased workload from the re-evaluation process.
8. Plaintiff reached maximum medical improvement on December 17, 2002, and was rated and released by Dr. Sebold. According to Dr. Sebold, plaintiff's permanent restrictions are that he should do no ladder climbing, no standing or walking over 30 minutes per hour, and that he should perform limited work on uneven surfaces.
9. In early January 2003, the State of North Carolina approved plaintiff's disability retirement application effective November 1, 2002. The approval was premised on a mistaken belief that plaintiff had not returned to work. Since plaintiff had returned to work, the approval was voided. *Page 5 
10. On January 13, 2003, plaintiff advised Bill Warren of Mecklenburg County that he wanted to re-apply for state disability retirement. In order to accommodate plaintiff's request, Mr. Warren submitted a letter in support of plaintiff's application. Mr. Warren showed the letter to plaintiff and specifically inquired whether plaintiff wanted the letter submitted. Plaintiff indicated that he did and that he was ready to retire. Plaintiff's official retirement date was scheduled for January 31, 2003, and plaintiff worked until that date. The technical assistant position that plaintiff performed from November 6, 2002, until January 31, 2003, was a sedentary job in which plaintiff used statistics to apply values to property. Approximately 99% of the job was done at a computer. Plaintiff never complained to Mr. Warren that he was having any difficulties performing the job. Plaintiff performed the job satisfactorily.
11. Dr. Robert Anderson examined plaintiff on February 28, 2003, in an independent medical evaluation. Dr. Anderson noted that plaintiff was at maximum medical improvement and would retain sedentary work restrictions, but noted that plaintiff's talus fracture had healed. Plaintiff has sought no additional medical treatment for his left leg since he last saw Dr. Anderson on November 12, 2003.
12. After plaintiff began receiving state disability retirement benefits, he submitted a motion to reinstate temporary total disability compensation. Defendant disputed plaintiff's entitlement to temporary total disability compensation since plaintiff had demonstrated an ability to work, and since plaintiff had elected to pursue state disability retirement benefits rather than working. The Commission's Executive Secretary filed an administrative order on March 27, 2003, in which she denied plaintiff's motion. Plaintiff appealed by submitting a Form 33, dated April 10, 2003. The dispute was resolved by a partial compromise settlement agreement, dated January 5, 2004, under the terms of which defendant agreed to reinstate temporary total disability *Page 6 
compensation effective November 1, 2003. In exchange, plaintiff agreed that he would cooperate with all vocational efforts offered by defendant. The partial compromise settlement agreement was approved by former Deputy Commissioner Edward Garner, Jr. by order filed March 8, 2004. Deputy Commissioner Garner's Order contained language ordering plaintiff to comply with all vocational efforts of defendant and that plaintiff's failure to comply with such efforts would subject plaintiff to possible termination of his disability benefits.
13. Susan Manning, Director of Human Resources for defendant, testified that it was defendant's policy to attempt to return to work employees with medical problems. Once an employee is released to return to work by his physician with restrictions that make it difficult for him to return to his former job, defendant contacts the employee's department to see if there are other jobs that might be appropriate for the employee. If there are no jobs available in that department, then defendant looks system-wide for other positions that might be available. Defendant has about 5,000 employees, and approximately 40 to 50% of those employees are in sedentary jobs. However, defendant did not attempt to return plaintiff to work or provide vocational rehabilitation services to him for the period of time between February 1, 2003, and March 23, 2004.
14. Following entry of the Commission Order on March 8, 2004, defendant hired Page Rehabilitation Services to work with plaintiff to help him find employment. The initial vocational consultant, Robin Terlizzi, first met with plaintiff and his attorney on March 23, 2004. When vocational rehabilitation services were assigned, Ms. Terlizzi was informed that defendant had no jobs available for plaintiff. Ms. Terlizzi began vocational efforts by looking for jobs for plaintiff with new employers. For the period of time from March to July 2004, Ms. Terlizzi did not find any suitable positions that were available for plaintiff. *Page 7 
15. Ms. Terlizzi's efforts to find employment for plaintiff ended abruptly on or about July 10, 2004, when plaintiff moved from his residence in Charlotte, North Carolina, to Marshall, Arkansas. Plaintiff had not previously told Ms. Terlizzi or any representatives of defendant that he was contemplating relocating to Arkansas. Plaintiff made the decision to move based on his mother's health. He called Ms. Terlizzi on July 22, 2004, to advise that the move was permanent. Despite his relocation, plaintiff has not sold or attempted to sell the residence he owns in Charlotte.
16. Plaintiff has lived in Marshall, Arkansas, since July 2004. Marshall has a population of about 1,300. The only other towns within a 30-mile radius of Marshall are Leslie, Arkansas, which has a population of about 500; St. Joe, Arkansas, which has a population of about 150; and Clinton, Arkansas, which has a population of about 3,000. Plaintiff indicated that most of the businesses within a 30-mile distance of his residence are logging operations, farms, and saw mills. Plaintiff has not sought any employment since moving to Arkansas and does not believe that any employment is available in the rural part of Arkansas where he lives. He also indicated that the wages for jobs in the area where he lives pay one third of what employers will pay for comparable work in Mecklenburg County. Plaintiff moved to Arkansas for family reasons and not for purposes of moving from a better job market to a more rural job market. However, plaintiff has not made reasonable efforts to find employment and there is insufficient evidence to show by the greater weight that it would be futile for plaintiff to seek employment in that area.
17. On October 6, 2004, Ms. Terlizzi contacted plaintiff, who at that time was at his residence in Charlotte, concerning a job opportunity with defendant as a Business Personal *Page 8 
Property Auditor I, or Auditor I position. The job requires no field work and is performed primarily at a desk.
18. The job description that was provided to Ms. Terlizzi for the Auditor I position indicated that it required lifting up to 50 pounds. However, Ms. Manning told Ms. Terlizzi on October 6, 2004, that the job description was drafted years earlier when individuals were required to lift heavy record books, and, because the records are now kept on tape, the lifting requirement for the position is no more than 10 pounds. Ms. Manning also advised Ms. Terlizzi that the Auditor I position is a sedentary desk job and requires minimal standing and walking. This information about the actual requirements of the position offered to plaintiff was conveyed to plaintiff's attorney by letter dated October 7, 2004, from Ms. Terlizzi.
19. Ms. Terlizzi sent the Auditor I job description to Dr. Sebold, but he did not respond whether plaintiff could physically perform the job. Ms. Terlizzi went on maternity leave on October 7, 2004. On December 15, 2004, Ms. Terlizzi's supervisor, George H. Page, sent the job description to Dr. Anderson, but in doing so he failed to mention that the job description was an old one and included certain requirements that are no longer applicable to the Auditor I position. Defendant was responsible for preparing the job description. Dr. Anderson submitted a response in which he indicated "no, I do not feel Mr. Treat is able to perform the duties described in the job description," but he also added: "Okay except unable to climb, balance, squat on left leg." On December 30, 2004, Ms. Manning advised Mr. Page that she had reviewed the doctor's response regarding the position, and that as she had previously indicated to Ms. Terlizzi, the job description was an old one. The requirements for climbing, balancing and squatting actually applied to the Auditor II position, which require field work, whereas the Auditor I job is performed in an office environment and requires no climbing, balancing or *Page 9 
squatting. An accurate job description was never submitted to Dr. Anderson. Plaintiff refused the job offer and Mr. Page then closed plaintiff's file on or about January 20, 2005.
20. The Full Commission finds based on the greater weight of the evidence that the Auditor I position offered to plaintiff was suitable and was within his restrictions. Many of the skills that plaintiff learned as a real estate appraiser and as a technical assistant would have transferred to the Auditor I position. Defendant would have provided plaintiff any additional training he needed in order to perform the job. Garrett Alexander, supervisor of the Auditor I unit, indicated that plaintiff needed one class which would last three to five days to obtain certification as an Auditor I. Plaintiff has 17 years experience as a real estate appraiser, is reportedly a quick learner and already has considerable analytical skills and the ability to make mathematical calculations. Vocational expert George Page expressed his opinion that the Auditor I position constituted suitable employment for plaintiff. In addition, although plaintiff was living in Arkansas at the time of the job offer, plaintiff continued to own a residence in Charlotte.
21. At the time of his accident, plaintiff earned $61,755.20 per year. He was at or near the maximum amount that defendant paid a real estate appraiser. Under defendant's return to work program, plaintiff qualified for the maximum salary of $48,902.00 allowable for an Auditor I. By August 2006, the maximum salary for an Auditor I had increased to $55,300.00. Defendant expects that the maximum salary for the Auditor I position will continue to rise. It is not unusual in cases of reassignment under the return to work program for an employee to start at the maximum amount allowed for a position. The Auditor I position was suitable to plaintiff's earning capacity in that his initial salary as an Auditor I would have paid him approximately 79% *Page 10 
of his average weekly wages as a real estate appraiser, his salary would have already increased to almost 90% of his former average weekly wages by August 2006, and plaintiff would have been eligible for future salary increases.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. On May 20, 2002, plaintiff sustained an admittedly compensable injury by accident arising out of and in the course of his employment with defendant. N.C. Gen. Stat. § 97-2(6).
2. As the result of his compensable injury by accident on May 20, 2002, plaintiff was temporarily totally disabled from any employment and entitled to receive temporary total disability compensation from the time that plaintiff stopped working at defendant until on or about January 20, 2005 when he unjustifiably refused an offer of suitable employment. Thereafter, plaintiff is not entitled to any compensation during the continuance of such refusal. N.C. Gen. Stat. § 97-32. Defendant has already paid this compensation to plaintiff.
3. Assuming arguendo that the job offered by defendant was not suitable employment, plaintiff also failed to prove continuing disability as a result of the compensable injury by accident. Plaintiff was not taken out of work by any doctor, was capable of some work but failed to show that he made a reasonable but unsuccessful effort to find employment, and he did not show that it was futile for him to seek employment due to other factors. Demery v. Perdue Farms, Inc.,143 N.C. App. 259, 545 S.E.2d 485 (2001); Russell v. Lowes ProductDistribution, 108 N.C. App. 762, 425 S.E.2d 454 (1993). *Page 11 
4. Plaintiff is entitled to receive all medical treatment related to his compensable injury by accident incurred or to be incurred that would reasonably effect a cure or provide relief or lessen plaintiff's period of disability. N.C. Gen. Stat. § 97-25.
 ***********
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commission makes the following:
 AWARD
1. Defendant shall pay plaintiff temporary total disability benefits at the rate of $654.00 per week from the time he left his employment with defendant until January 20, 2005, when he unjustifiably refused suitable employment. Plaintiff's claim for additional compensation is suspended until such time as he ceases his refusal of suitable employment with defendant or another employer.
2. Defendant shall pay all medical expenses resulting from plaintiff's compensable injury by accident.
3. Defendant shall be responsible for the costs of this action, including expert witness fees of $175.00 each to Mr. Page and Ms. Terlizzi, if not already paid.
This 17 day of August, 2007.
 S/__________
 LAURA KRANIFELD MAVRETIC
 COMMISSIONER
CONCURRING:
S/__________ BUCK LATTIMORE CHAIRMAN
S/_________ DIANNE C. SELLERS COMMISSIONER *Page 1